# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

JAIMEE LEE,

        Plaintiff,

vs.

DIET CENTER, LLC, *et al.*,

        Defendants.

Case No.: 2:19-cv-00628-GMN-EJY

**ORDER**

Pending before the Court is the Motion to Dismiss, (ECF No. 9), filed by Defendants Diet Center LLC, doing business as Heart Attack Grill ("Heart Attack Grill"), and Jon Basso ("Basso") (collectively "Defendants"). Plaintiff Jaimee Lee ("Plaintiff") filed a Response, (ECF No. 25), and Defendants filed a Reply, (ECF No. 26). For the reasons discussed below, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion to Dismiss.

**I.**     **BACKGROUND**

This case arises from allegations of sexual harassment during Plaintiff's employment at Heart Attack Grill, which is a restaurant located on Fremont Street in Las Vegas, Nevada. (First Am. Compl. ("FAC") ¶ 12, ECF No. 1-4). The restaurant is "hospital themed," and it requires waitresses to dress as nurses in "scantily clad" uniforms. (*Id.* ¶¶ 12–13). Plaintiff began her employment there on October 13, 2011. (*Id.* ¶ 16). Defendant Basso is the restaurant's "owner and operator," and he served as Plaintiff's supervisor. (*Id.* ¶ 14).

Plaintiff alleges that, during her first few years at Heart Attack Grill, Basso "displayed a volatile temper towards employees" and "unpredictable behavior." (*Id*. ¶ 17). In 2015, Basso's behavior developed into inappropriate romantic gestures aimed at Plaintiff. (*Id.* ¶¶ 18–19). These gestures began as deliveries of roses, but later turned derogatory and controlling. (*Id.*)

(discussing a delivery of flowers to Plaintiff's home "on at least four occasions" in 2015, and around May of 2016 he "yelled at [Plaintiff] and told her how 'disgusted' he was" that she was dating "someone with tattoos"). Basso also arrived at Plaintiff's home on at least one occasion in October of 2016 to express his love for her. (*Id.* ¶ 20). Plaintiff then told Basso that she did not reciprocate his feelings and that any continued affection or sexual advances were unwanted. (*Id.* ¶¶ 21–22). About one month later, Basso terminated Plaintiff's employment with Heart Attack Grill. (*Id.* ¶¶ 23–24) (alleging that the termination was largely based on apparent redactions in a background check Plaintiff underwent as part of the process to become "the key liquor license employee for the restaurant").

Approximately one week after her termination, Defendants reinstated Plaintiff at the Heart Attack Grill. (*Id.* ¶ 26). Basso's inappropriate conduct toward Plaintiff allegedly continued. (*Id.* ¶¶ 28–30). On numerous occasions, Basso sent Plaintiff various letters discussing his romantic attraction to her, and he also made "a number of harassing and inappropriate comments" to her through text messages and handwritten notes. (*Id.* ¶¶ 30–32).

In November of 2017, Basso again terminated Plaintiff from employment with the Heart Attack Grill. (*Id.* ¶¶ 37–38, 42). Plaintiff accordingly brought this lawsuit in the Eighth Judicial District Court for Clark County, Nevada ("Nevada state court"), by filing a Complaint against Defendants on January 15, 2019. (Compl., Ex. A to Pet. Removal, ECF No. 1-2). Plaintiff later amended her Complaint, ultimately asserting four claims for relief: (1) declaratory relief, against Heart Attack Grill; (2) sexual harassment and hostile work environment in violation 42 U.S.C. § 2000e *et. seq.* and Nevada Revised Statute § 613.330, against Heart Attack Grill; (3) retaliation in violation of 42 U.S.C. § 2000e-3 *et. seq.* and Nevada Revised Statute § 613.340, against Heart Attack Grill; and (4) intentional infliction of emotional distress, against Basso. (FAC ¶¶ 52–88).

On April 11, 2019, Defendants removed the lawsuit from Nevada state court to this Court

by filing their Notice of Removal, (ECF No. 1).  Roughly four weeks later, Defendants filed the pending Motion to Dismiss Plaintiff's First Amended Complaint, (ECF No. 9), pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) mandates that a court dismiss a cause of action that fails to state a claim upon which relief can be granted. *See N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In considering whether the complaint is sufficient to state a claim, the Court will take all material allegations as true and construe them in the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).

The Court, however, is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  A formulaic recitation of a cause of action with conclusory allegations is not sufficient; a plaintiff must plead facts showing that a violation is *plausible*, not just possible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

A court may also dismiss a complaint pursuant to Federal Rule of Civil Procedure 41(b) for failure to comply with Federal Rule of Civil Procedure 8(a). *Hearns v. San Bernardino Police Dept.*, 530 F.3d 1124, 1129 (9th Cir. 2008).  Rule 8(a)(2) requires that a plaintiff's complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion . . . . However, material which is properly submitted as part of the complaint may be considered on a motion to dismiss." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citations omitted). Similarly, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting the motion to dismiss into a motion for summary judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994). Under Federal Rule of Evidence 201, a court may take judicial notice of "matters of public record." *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986). Otherwise, if the district court considers materials outside of the pleadings, the motion to dismiss becomes a motion for summary judgment. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001).

If the court grants a motion to dismiss, it must then decide whether to grant leave to amend. The court should "freely give" leave to amend when there is no "undue delay, bad faith[,] dilatory motive on the part of the movant . . . undue prejudice to the opposing party by virtue of . . . the amendment, [or] futility of the amendment . . . ." Fed. R. Civ. P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182 (1962). Generally, leave to amend is only denied when it is clear that the deficiencies of the complaint cannot be cured by amendment. *See DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).

### III. DISCUSSION

Defendants move for dismissal of Plaintiff's First Amended Complaint on three grounds. The first ground arises from contracts executed by Plaintiff in October of 2016 and June of 2017, wherein Plaintiff supposedly agreed to not bring claims against Defendants for conduct that occurred during her employment with Heart Attack Grill between 2011 and 2017. (Mot. Dismiss 2:21–3:13, 6:11–9:19). Defendants' second ground for dismissal is specific to

Plaintiff's declaratory relief claim. Defendants argue that this claim is either duplicative of Plaintiff's harassment and retaliation claims or it improperly seeks an advisory opinion from the Court; and thus, it cannot stand as an independent cause of action. (*Id.* 9:20–11:22). In the last ground for dismissal, Defendants argue that Plaintiff fails to plead sufficient factual allegations in her First Amended Complaint to support her fourth claim of intentional infliction of emotional distress. (*Id.* 11:23–14:2). Defendants add that even if Plaintiff included sufficient allegations for this fourth claim, the claim still fails as a matter of law because it must have been brought under the Nevada Industrial Insurance Act (Nevada Revised Statute 616A–616D). (*Id.* 14:327). The below discussion addresses each ground for dismissal in turn, beginning with the contracts supposedly waiving claims against Defendants.

**A. Release of Claims**

Defendants provide the Court with two "Release of Claims" signed by Plaintiff. (Mot. Dismiss 6:15–16); (October 2016 Release, Ex. A to Mot. Dismiss, ECF No. 9-2); (June 2017 Release, Ex. B to Mot. Dismiss, ECF No. 9-3). Defendants state that Plaintiff signed the first Release of Claims on October 28, 2016 ("2016 Release"), after Heart Attack Grill terminated Plaintiff for failing to include information about her background when applying to become the restaurant's key liquor license employee. (Mot. Dismiss 3:18–4:1); (October 2016 Release at 2 of 3, Ex. A to Mot. Dismiss). Months later, Plaintiff executed another Release of Claims on June 13, 2017 ("2017 Release"). (*Id.* 4:13–18). From Defendants' perspective, these Releases bar any causes of action in the First Amended Complaint insofar as they concern conduct by either Defendant between 2011 to June of 2017. (*Id.* 6:8–11). Defendants acknowledge that "events related to [Plaintiff's] employment after June 14, 2017 may not be barred by the parties' June 2017 release." (*Id.* 6:11–14). However, Defendants claim that the First Amended Complaint still fails because the factual allegations do not clearly identify which conduct giving rise to Plaintiff's claims occurred after the 2017 Release. (*Id.*). In response, Plaintiff argues

that both the 2016 Release and 2017 Release are unenforceable because they are not supported by valid consideration, both violate public policy, and, even if they were enforceable, allegations of conduct occurring after June 13, 2017, can support her claims.

### 1. *Incorporation by Reference*

Before discussing the Releases' impact on Plaintiff's claims, the Court must first determine whether it can consider either document when ruling on Defendants' 12(b)(6) Motion. Defendants argue that the Court can consider these Releases even at this early stage because Plaintiff's complaint incorporates them by reference. (Mot. Dismiss 4:24–28 n.2).

"[T]he mere mention of the existence of a document is insufficient to incorporate the contents of a document." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (citing *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)). For courts to consider a document not attached to a complaint, the claims must "necessarily depend" on the document or the complaint must extensively refer it. *Khoja v. Orexigen Therapeutics*, Inc., 899 F.3d 988, 1002 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 139 S. Ct. 2615 (2019).

Here, the Court agrees with Defendants and finds that the First Amended Complaint incorporates the Releases' content by reference, which allows the Court to consider them when ruling on Defendants' 12(b)(6) Motion. Plaintiff's First Amended Complaint explicitly discusses "two releases of claims that [Plaintiff] was forced to sign as a condition of employment." (FAC ¶ 55). Among her factual allegations, Plaintiff preemptively declares that she "did not receive any consideration in exchange for executing these releases," and so "the agreements are not binding as to [her]." (*Id.* ¶ 56). Plaintiff also requests as part of the relief in this case a declaration "setting forth the duties and rights of the parties, particularly in light of the releases." (*Id.* 18:19–21).

Though the Court can consider the Releases' content at this stage, the next overarching issue is whether the Releases are valid under basic principles of contract formation. For

purposes of Defendants' 12(b)(6) Motion, the Releases' validity depends on them being supported by "consideration."[1] *See May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005); (Resp. 9:24–11:14) (challenging the Releases as unsupported by valid consideration, rather than arguing that there was not an offer and acceptance or a meeting of the minds).

### 2. *Consideration for the Releases*

Plaintiff alleges that she was an "at-will" employee with Heart Attack Grill. (FAC ¶ 56). Under Nevada law, at-will employees generally have "no contractual rights arising from the employment relationship that limit the employer's ability . . . to change the terms of employment." *Baldonado v. Wynn Las Vegas, LLC*, 194 P.3d 96, 106 (Nev. 2008). Accordingly, when an employer unilaterally modifies the terms of an at-will employment arrangement "in prospective fashion[,] the employee's continued employment constitutes sufficient consideration" to be bound by that modification. *Id.* In other words, the employee's continued employment under modified terms "constitutes acceptance of, and consideration for, what is essentially a new employment arrangement." *Id.* n.39.

#### *i. 2016 Release*

Defendants contend that valid consideration supports the 2016 Release because Plaintiff executed it in exchange for her reinstatement as an at-will employee with Heart Attack Grill. The terms of the 2016 Release support this contention. (October 2016 Release, Ex. A to Mot. Dismiss) ("In consideration of the opportunity to regain lucrative employment at the Heart Attack Grill, [Plaintiff] . . . releases and forever discharges [Defendants] . . . from all manner of actions, causes of action . . . claims and demands for or by reason of any damage, loss, or injury . . . at any time during the years of 2011–2016."). Consequently, the plain terms of the October

---

[1] Plaintiff makes several allegations that she was wrongfully forced into signing the Releases. (FAC ¶ 55). She also argues in her Response that she was "coerced into signing" the Releases. (Resp. 11:20–26). However, the Response does not specifically argue that formation defenses such as fraud or coercion should render the Releases void at this early stage. The Court thus reserves ruling on these factual issues.

2016 Release, when combined with allegations in the First Amended Complaint, demonstrate that valid consideration supports this agreement. (FAC ¶ 23–26) (alleging Plaintiff's termination around October of 2016 and reinstatement shortly afterward). The 2016 Release's terms also contradict Plaintiff's allegation that the only consideration was "ongoing at-will employment." (*Id.* ¶ 56).

                        *ii. 2017 Release*

In contrast to the 2016 Release, the 2017 Release does not offer Plaintiff reinstatement as consideration for acceptance. Defendants instead contend that the 2017 Release offered a guarantee for "six months of continued employment" upon execution. (Mot. Dismiss 4:17–22, 7:12–15). The 2017 Release's terms do not explicitly state such a guarantee. At this early stage, however, the Court finds that the plain terms could at least be reasonably construed as providing Plaintiff with the ability to pursue employment with Heart Attack Grill for six months in exchange for discharging claims. That is, one provision states Plaintiff "agrees to enter into a commemoration of this Release of Claim . . . every six months," and another provision explains that the agreement arises "in consideration of the opportunity to continue lucrative employment." (June 2017 Release, Ex. B to Mot. Dismiss).

But even if the Court accepted Defendants' position that consideration for the 2017 Release was a guarantee to Plaintiff of continued employment for six months, Plaintiff's allegations show that Defendants breached this obligation. Specifically, the 2017 Release shows that Plaintiff executed it on June 13, 2017, yet the First Amended Complaint alleges that Defendants terminated her five months later—on November 13, 2017. (FAC ¶ 42). Defendants' breach of their six-month guarantee would mean the 2017 Release no longer binds Plaintiff, and she can bring her claims so long as they concern conduct occurring after October 29, 2016. *See Cain v. Price*, 415 P.3d 25, 29 (Nev. 2018) ("When parties exchange promises to

perform, one party's material breach of its promise discharges the non-breaching party's duty to perform.").

Perhaps recognizing their breach, Defendants assert for the first time in their Reply that Plaintiff gained other benefits for accepting the 2017 Release, as stated in an Employee Agreement. (Reply 4:11–18). Defendants argue that the Court can consider the Employee Agreement at this stage "[b]ecause the Release is incorporated by reference." (*Id.* 4:26–28 n.1). However, the First Amended Complaint makes no reference to this Employee Agreement. Nor do Plaintiff's claims rely on the Employee Agreement's terms. The Court thus cannot consider the Employee Agreement when ruling on Defendants' 12(b)(6) Motion. *See Khoja*, 899 F.3d at 1002 ("[I]f the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint."). Moreover, converting Defendants' 12(b)(6) Motion into one for summary judgment is inappropriate here because Defendants included the Employee Agreement only in their Reply—thus depriving Plaintiff of any opportunity to respond. *Id.* As a result, when considering Plaintiff's allegations alongside the incorporated 2017 Release at this stage of proceedings, Defendants breached the only form of consideration supporting the 2017 Release. The 2017 Release, consequently, cannot serve as a basis to dismiss any part of Plaintiff's First Amended Complaint at this stage.

### 3. *Public Policy*

Besides arguing that valid consideration does not support the Releases, Plaintiff argues that the Releases violate public policy because they "effectively silence [her] and prevent her from bringing forth claims of sexual harassment, hostile work environment, and retaliation." (Resp. 11:20–21). According to Plaintiff, the Releases "run counter to Nevada's express policy" against harassment and discrimination as codified in Nevada Revised Statutes 613.330 *et seq*. Plaintiff adds that the Releases further violate public policy because they prevent her from participating or cooperating in an investigation conducted by agencies like the Equal

Employment Opportunity Commission and the Nevada Equal Rights Commission. (*Id.* 12:2–9) (quoting the 2017 Release, Ex. B to Mot. Dismiss, and highlighting language preventing Plaintiff from making "any adverse public or private statements against the Releasee."). Last, Plaintiff appears to argue that the Court should predict a shift in Nevada law to ban release agreements that cover employment discrimination and harassment claims (like in California). (*Id.* 12:10–26).

Because Defendants have not shown how valid consideration supports the 2017 Release, the Court need only consider whether the 2016 Release violates Nevada public policy. In doing so, the Court disagrees with Plaintiff that the 2016 Release is void on public policy grounds because it prevents her from bringing harassment and retaliation claims. Though the 2016 Release is broad, it covers only Defendants' conduct occurring before she executed the agreement.[2] This Circuit has generally found such agreements to not violate public policy; and Plaintiff does not provide authority under Nevada law that persuades the Court to now find otherwise. *Cf. Stroman v. W. Coast Grocery Co.*, 884 F.2d 458, 460–61 (9th Cir. 1989) (quoting *Rogers v. General Elec. Co.*, 781 F.2d 452, 454 (5th Cir. 1986)) ("A general release of Title VII claims does not ordinarily violate public policy. To the contrary, public policy favors voluntary settlement of employment discrimination claims brought under Title VII.").

As for Plaintiff's argument that the 2016 Release is void on public policy grounds because it prevents her from complying with state and federal investigations, the 2016 Release does not appear to prevent such actions. It states at the end how "this Agreement will be construed in accordance with and governed by the law of the State of Nevada." (2016 Release,

---

[2] Plaintiff argues that the 2016 Release prevents her from "ever coming forward with claims of workplace sexual harassment" against Defendants. (Resp. 11:20–26). This argument misstates the contractual language. The 2016 Release explicitly declares that it applies to injuries or claims "as a consequence of employment at the Heart Attack Grill restaurants at any time during the years of 2011-2016." (2016 Release, Ex. A to Mot. Dismiss). So, the Court is not faced with considering if public policy warrants invaliding an agreement that preemptively bars unknown harassment and discrimination claims against into perpetuity.

Ex. A to Mot. Dismiss). Though this statement appears to merely identify the governing law, the portion disclosing how the Release will be construed "in accordance with" governing laws appears ambiguous and could reasonably mean that the Release cannot be used to violate legally required duties—such as compliance with a government investigation. *See, e.g.*, *E.E.O.C. v. Severn Trent Servs., Inc.*, 358 F.3d 438, 442 (7th Cir. 2004) (reasoning that "a nondisparagement clause can no more trump a subpoena issued by a government agency than any private contract could" because doing so would amount to "obstructions of justice"); *E.E.O.C. v. Astra U.S.A., Inc.*, 94 F.3d 738, 744 (1st Cir. 1996); *Fed. Trade Comm'n v. AMG Servs., Inc.*, No. 2:12:cv-00536-GMN-VCF, 2013 WL 12320929, at *2 (D. Nev. Aug. 20, 2013). Without facts showing that Defendants intended the 2016 Release to bar Plaintiff's cooperation with legally required duties, the Court finds no basis to now read in that restriction.

Last, regarding Plaintiff's argument that the Court should invoke a California law which bars agreements preventing disclosure of unlawful employment practices, Cal. Gov't Code § 12964.5, Nevada has not enacted identical legislation. While Nevada turns to California law for guidance when interpreting similar legislation or causes of action, that does not mean courts can essentially adopt legislation enacted outside the jurisdiction. *See Mort v. United States*, 86 F.3d 890, 893 (9th Cir. 1996). Moreover, California's decision to enact legislation on this issue does not persuade the Court to now predict a future shift in Nevada public policy that would find the 2016 Release void. *Cf. Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1203 (9th Cir. 2002) (explaining that, in making a prediction about how a state's highest court would resolve an issue, "federal courts look to existing state law without predicting potential changes in that law."). Accordingly, Plaintiff has not demonstrated under Nevada law that the 2016 Release violates public policy and must be invalidated for purposes of this case.

### 4. *Scope of the Release*

Since Defendants have not (at this stage) shown how valid consideration supports the

2017 Release, the next issue is how far the 2016 Release extends to prevent Plaintiff from bringing her claims. According the 2016 Release's terms, it applies to "any damages as a result of the termination [on October 20, 2016] or for any other damage, loss or injury to person, reputation, or property which may have been sustained as a consequence of any aspect of her employment or interaction with any persons associated with the Heart Attack Grill at any time during the years of 2011-2016." (2016 Release, Ex. A to Mot. Dismiss). The 2016 Release also covers the following:

> In consideration of the opportunity to regain lucrative employment at the Heart Attack Grill, the receipt and sufficiency of which consideration is acknowledged, the Releasor releases and forever discharges the Releasee, its owners, directors, officers, employees, agents, assigns, legal representatives and successors from all manner of actions, causes of action, debts, accounts, bonds, contracts, claims and demands for or by reason of any damage, loss or injury to person, reputation, or property which may have been sustained as a consequence of employment at the Heart Attack Grill restaurants at any time during the years of 2011-2016.

(*Id.*). Based on this broad language, the Court finds that the 2016 Release bars Plaintiff's claims to the extent that they rely on Defendants' conduct during her employment between 2011 and 2016.

Notably, Defendants only challenge Plaintiff's second and third causes of action as being barred by the 2016 and 2017 Releases *together*. (Mot. Dismiss 6:9–11) (arguing that Plaintiff's claims "are not actionable to the extent the events leading up to those claims all occurred on or before June 13, 2017 and were released pursuant to the release of all claims."). Thus, Defendants' present 12(b)(6) Motion does not require the Court to evaluate whether Plaintiff provided sufficient allegations to support these two claims based on facts occurring only after the 2016 Release. Besides, most of Plaintiff's allegations supporting these claims appear to concern conduct occurring after she executed the 2016 Release. (FAC ¶¶ 26–44).

**B. Declaratory Relief**

Defendants argue that Plaintiff's First Amended Complaint includes a declaratory relief

request which purely seeks an advisory opinion from the Court. The particular provisions at issue exist in Plaintiff's first cause of action for "Declaratory Relief" and Plaintiff's request for relief of "a declaration and Order setting forth the duties and rights of the parties particularly in light of the releases which Heart Attack Grill asserts bars certain portions of Plaintiff's claims." (FAC ¶¶ 52–57, 18:19–21). According to Defendants, this request for declaratory relief should fail because Nevada Revised Statutes 613.330 *et seq.* provide the exclusive statutory remedy for tort claims based on unlawful employment practices. (Mot. Dismiss 11:15–19). Defendants thus contend that there is "no reason for the declaratory relief action, when she is already attempting to litigate these claims against Defendants." (*Id.* 11:19–22).

The Court agrees, in part, with Defendants. The Supreme Court of Nevada has held that NRS § 613.330 *et seq.* "provides the exclusive remedy for tort claims premised on illegal employment practices." *Williams v. Aria Resort & Casino, LLC*, No. 2:17-cv-1484-JCM-VCF, 2019 WL 2716765, at *8 (D. Nev. June 28, 2019) (citing *Brinkman v. Harrah's Operating Co., Inc.*, 2008 WL 11389180, at *5 (D. Nev. Oct. 16, 2008), *Sands Regent v. Valgardson*, 777 P.2d 898, 900 (Nev. 1989), and *D'Angelo v. Gardner*, 819 P.2d 206, 217 n.10 (Nev. 1991)). To the extent Plaintiff seeks declaratory relief in the alternative to, or in addition to, relief under her second and third claims for violations of NRS 613.330, her declaratory relief claim necessarily fails. Nevertheless, Plaintiff's declaratory relief claim partly requests that the Court evaluate the "releases of claims" to determine if they bar portions of her Complaint. (FAC ¶¶ 55–56, 18:19–21). For that request, there is a live controversy that the Court can decide, and it is not preempted by a statutory scheme. Nev. Rev. Stat. § 30.030; *Knittle v. Progressive Cas. Ins. Co.*, 908 P.2d 724, 725 (Nev. 1996) (listing the requisite conditions for declaratory relief to be appropriate). Accordingly, Plaintiff's request for declaratory relief is actionable, in part.

**C. Intentional Infliction of Emotional Distress**

Defendant Basso brings two challenges to Plaintiff's fourth claim for intentional

infliction of emotional distress ("IIED"): (1) Plaintiff's factual allegations do not support a plausible claim; and (2) the Nevada Industrial Insurance Act ("NIIA") provides the exclusive remedy for injuries allegedly sustained by employees that arise out of, and in the course of, employment. (Mot. Dismiss 11:25–2, 14:4–7). The below discussion first addresses whether the Nevada Industrial Insurance Act preempts Plaintiff's IIED claim, then the sufficiency of her factual allegations.

### 1. *Nevada Industrial Insurance Act*

From Defendant Basso's perspective, Plaintiff's allegations are "inexorably intertwined" with injuries suffered in the course of her employment at Heart Attack Grill. Defendant Basso thus argues that the Nevada Industrial Insurance Act preempts Plaintiff's IIED claim, as illustrated in *Wood v. Safeway*, 121 P.3d 1026, 1031, 1034 (Nev. 2005). (Reply 7:26–8:20).

In *Wood v. Safeway*, the Nevada Supreme Court held that an employee's negligence-based tort claims against her employer stemming from an alleged sexual assault fell within the NIIA because "the nature of the employment contributed to or otherwise increased the risk of assault beyond that of the general public." *Id.* at 1034. The court arrived at that holding because of the following facts: the assailant's only contact with the assaulted employee was through employment; the assaults occurred while the employee was performing her job duties; and the assault "was not imported into the workplace or otherwise the result of motivations peculiar to the assailant and the victim that are unrelated to the employment." *Id.* The court explained, however, that NIIA preemption would not have applied to the employee's negligence-based claims if "the animosity or dispute which culminate[d] in the assault [was] imported into the place of employment from the injured employee's private or domestic life, . . . at least where the animosity [was] not exacerbated by the employment." *Id.*

Importantly, decisions by the Nevada Supreme Court later evaluating *Wood* hold that the NIIA does not preempt claims for injuries arising from intentional torts committed by a

coemployee. *Fanders v. Riverside Resort & Casino, Inc.*, 245 P.3d 1159, 1164 (Nev. 2010) ("We now make that implication express and hold that when a plaintiff states a viable intentional tort claim against a coemployee, that claim is not barred by the NIIA's exclusivity provisions."); *Conover v. Vons Stores, Inc.*, No. 2:11-cv-01806-GMN, 2012 WL 4482591, at *4 (D. Nev. Sept. 25, 2012). Further, courts are hesitant to apply *Wood's* broad preemption rule to claims based on "significant non-work interactions between the victim and alleged assailant." *Painter v. Atwood*, 912 F. Supp. 2d 962, 966 (D. Nev. 2012).

Here, Plaintiff's IIED claim falls outside of NIIA preemption because it is an intentional tort against Basso. Regardless, Plaintiff provides significant allegations of Basso's wrongful conduct outside of work, which evade the preemption rule outlined in *Wood v. Safeway*. (FAC ¶¶ 28–32). The remaining issue, then, is whether Plaintiff alleges a plausible IIED claim in the First Amended Complaint.

### 2. *Plausibility*

To allege a plausible claim for IIED, Plaintiff's allegations must show three elements: (1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff having suffered severe or extreme emotional distress, and (3) actual or proximate causation. *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1386 (Nev. 1998). "Extreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community." *Maduike v. Agency Rent–A–Car*, 953 P.2d 24, 26 (Nev. 1998) (quotations omitted).

Here, Plaintiff's allegations support "extreme and outrageous conduct" by Defendant Basso. Following reinstatement in 2016, Plaintiff alleges Basso made repeated inappropriate sexual advances to her both at work and at her home, sent degrading messages to her, lodged personal insults at her, and texted her a nude picture of himself. Like other decisions in this District, the Court finds that Basso's alleged conduct plausibly supports the first element to an

IIED claim. (FAC ¶¶ 28–32); *see Burns v. Mayer*, 175 F. Supp. 2d 1259, 1268 (D. Nev. 2001); *Switzer v. Rivera*, 174 F. Supp. 2d 1097, 1108 (D. Nev. 2001).

Regarding the second element of Plaintiff's IIED claim, her allegations must demonstrate "serious emotional distress" causing physical injury or illness. *Roche v. Audio Visual Servs. Grp., Inc.*, No. 209-CV-01810-LDG-GWF, 2010 WL 3021575, at *2 (D. Nev. July 28, 2010) (citing *Olivero v. Lowe*, 995 P.2d 1023 (Nev. 2000)). Here, however, Plaintiff's allegations as to this second element are conclusory. She merely alleges that she "suffered from severe and extreme emotional distress, humiliation, embarrassment, loss of self-esteem, and other general emotional distress." (FAC ¶ 87). As an allegation that recites the bare element of an IIED claim, it falls short of what other courts in this District have found as sufficient to *plausibly* allege "serious emotional distress" causing physical injury or illness for purposes of an IIED claim. *Cf. Williams v. Allegiant Air*, No. 2:19-cv-00276-JAD-VCF, 2019 WL 1811006, at *2 (D. Nev. Apr. 5, 2019), *report and recommendation adopted*, 2019 WL 1804607 (D. Nev. Apr. 24, 2019) (finding the following allegation provided sufficient factual content to plausibly support the second element of an IIED claim when read liberally: a diagnosis of "[h]igh [s]tress with enlarged blood cells," "migraines," "depression, anxiety, stress, sleeplessness, loss of appetite, humiliation, [ ] embarrassment," "extreme emotional distress, [and] indignity."). The Court accordingly dismisses Plaintiff's IIED claim, but without prejudice and with leave to amend. *See Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## IV. CONCLUSION

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss, (ECF No. 9), is **GRANTED in part** and **DENIED in part**. Plaintiff's Declaratory Relief Claim is **DISMISSED, in part, with prejudice** to the extent it requests a declaration on liability for violations of Title VII, NRS 613.33, and NRS 613.340. Plaintiff's claim for intentional

infliction of emotional distress is dismissed without prejudice as discussed in this Order. Plaintiff shall have twenty-one days from the date of this Order to amend her IIED claim. Failure to timely amend the claim will constitute abandonment and consent to its dismissal with prejudice.

**DATED** this __31__ day of March, 2020.

_____
Gloria M. Navarro, District Judge
United States District Court